# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                     Case No. 09-CV-10463

FOUR HUNDRED SEVENTY SEVEN (477)
FIREARMS,

       Defendants.

_____/

## ORDER GRANTING THE GOVERNMENT'S MOTION TO STRIKE CLAIMS OF GREGORY KISH, SHERRY HARNESS, AND GABRIEL KISH, IV

Pending before the court is a "Motion to Strike Claims of Gabriel Kish, IV, Gregory Kish, and Sherry Harness Based Upon Lack of Article III, Section 2 or Statutory Standing," filed by the Government on December 15, 2009. Having reviewed the briefs, the court concludes a hearing on this motion is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant the Government's motion.

## I. BACKGROUND

This case is an *in rem* civil forfeiture action in which the Government requests the forfeiture of 477 firearms. The firearms were seized after the execution of a federal search warrant at the Highland Gun Barn, a gun store in Highland, Michigan, in which Claimants Gabriel Kish III and Deborah Summers were proprietors. (Am. Compl. ¶ 7(a).) Firearms were retrieved from the main store area, the attic, a gun smithing area, and a vault in the basement. (*Id.* ¶ 7(ss).)

The search warrant was issued following an undercover operation by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). From August 2007 to July 2008, undercover ATF agents purchased firearms from Deborah Summers and Gabriel Kish

III and exchanged purported stolen merchandise for firearms. (*Id.* ¶ 7(j)-(oo).) Deborah Summers has never held a federal firearms license, and Gabriel Kish III's federal firearms license was revoked in February 2005. *(Id.* ¶ 7(g)-(h).)

On September 17, 2008, Gabriel Kish III and Deborah Summers were indicted for willfully engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1). They were both convicted on April 17, 2009. Deborah Summers was sentenced to a term of imprisonment of 57 months; Gabriel Kish III was sentenced to a term of imprisonment of 48 months. At the sentencing hearing, the court found:

> no reason to exclude the firearms that were found in the basement and in the attic, . . . [a]nd the preponderance of the evidence convinces me that those firearms were indeed available for sale. They were not a collector's item grouping of firearms. They were, in large measure, common firearms that were "collected" if at all for the purpose of acquiring a stock in trade in order to sell, should a willing purchaser present himself and wish to buy such an item.
>
> So I am satisfied by the appropriate standard, that is a preponderance of the evidence that more than 200 firearms were involved in the offense of dealing in firearms without a license. And I accept the probation officer's, and accordingly, the Government's argument in that regard.

(9/1/09 Tr. at 39.)

In this case, the Government alleges that the firearms seized from the Highland Gun Barn, including the guns in the basement vault, are subject to forfeiture pursuant to 18 U.S.C. § 924(d)(1), which provides, in pertinent part, for the forfeiture of firearms "involved in or used in" any willful violation of 18 U.S.C. § 922(a)(1). (Am. Compl. ¶ 6.) A number of persons filed claims to these firearms, including now-convicted felons Gabriel Kish III and Deborah Summers. Relevant to the present motion, three of

Gabriel Kish III's children, Sherry Harness, Gregory Kish, and Gabriel Kish IV, filed claims to firearms numbered "5, 9, 10, 11, 16, 17, 19, 20, 21, 27, 35, 36, 43, 44, 84, 97-116, 199, 120, 121, 124, 126-163, 165-200, 205-476." (Suppl. Claims of Sherry Harness, Gregory Kish, Gabriel Kish, IV.) Each alleges that "[a]t the time of the seizure, I had a lawful interest in the property as the owner of these firearms and/or heir to them." (*Id.*) They claim that the firearms found in the basement vault "constitute a private family collection and were not offered for sale." (*Id.*) The Claimants filed a "more definite statement of claims" on August 3, 2009. It stated that "Claimant Gabe Kish III's children . . . are claiming the balance of the firearms on the basis that they are the owners and/or intended heirs of the remaining guns which were not offered for sale and have filed their claims accordingly." (Claimants' More Definite Statement of Claims ¶ 7.) On December 15, 2009, the Government filed a motion to strike the claims of Gabriel Kish IV, Gregory Kish, and Sherry Harness for lack of standing.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is

appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing' –that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter,* 369 F.3d 906, 909 (2004) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587 (1986)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.

### III.  DISCUSSION

### A.  Standing

To contest a government forfeiture action, a claimant must have both statutory standing in accord with the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") and standing under Article III. *$515,060.42 v. United States*, 152 F.3d 491, 497 (6th Cir.

1998) (citing *United States v. $267,961.07*, 916 F.2d 1104, 1107 (6th Cir. 1990)).  In this case, the Government argues that the Claimants lack Article III standing.[1]

Article III, § 2 of the United States Constitution requires the existence of a case or controversy through all stages of federal judicial proceedings.  Throughout the litigation, the petitioner "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).  The injury must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent,'" not conjectural or hypothetical.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

To satisfy Article III's standing requirement in civil forfeiture cases, "a claimant must have a colorable ownership, possessory or security interest in at least a portion of

---

[1] The Government requests summary judgment on the basis of the Claimants' lack of Article III standing and statutory standing.  Statutory standing is met by strict compliance with the Supplemental Rules for Certain Admiralty and Maritime Claims. *See* Fed. R. Civ. P. Supp Rule G(5)(a)(I); *see also $515,060.42*, 152 F.3d at 497 (stating that a claimant must meet the statutory standing requirements as provided in Supplemental Rule C(6)); *United States v. $5,730.00*, 109 F. App'x 712, 713 (6th Cir. 2004) (explaining what is required in order to satisfy statutory standing under Supplemental Rule C(6)); Gov't's Mot. Br. at i ("It should be noted that courts sometimes refer to statutory standing in forfeiture cases when referring to the pleading requirements of Supplemental Rule of Civil Procedure G(5).").  Here, the Government does not contest that the Claimants complied with the Supplemental Rules.  Instead, the Government's statutory standing argument is based on the definition of "owner" for purposes of the innocent owner defense, 18 U.S.C. § 983(d)(1).  The Government, despite presenting argument on the innocent ownership defense in its brief, concedes that "the issue of Gabriel Kish IV's lack of an innocent ownership defense is not ripe" and notes that "the Government will refrain from filing such a motion at present in the interest of conserving judicial resources."  (Gov't's Mot. Br. at 3.)  As this issue is not properly before the court and in light of the court's determination that the Claimants lack Article III standing, the court will not address Gabriel Kish IV's alleged lack of an innocent ownership defense or what the Government has termed a statutory standing argument.

the defendant property." *$515,060.42*, 152 F.3d at 497. A claimant is required to "demonstrate a legally cognizable interest in the defendant property." *United States v. $267,961.07*, 916 F.2d 1104, 1107 (6th Cir. 1990). While a "property interest less than ownership, such as a possessory interest, is sufficient to create standing," *id.*, the mere "assertion of simple physical possession," without accompanying factual allegations regarding the nature and acquisition of possession is insufficient. *$515,060.42*, 152 F.3d at 498. "Similarly, bare legal title, in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture." *Id.* at 498 n.6. The Claimant has the burden of demonstrating standing. *Id.* at 498.

Here, the Government argues that the Claimants lacks Article III standing because they have not "identified any ownership interest beyond an alleged inchoate expectation interest in the defendant firearms." (Gov't Mot. Br. at 13.) Specifically, the Government argues that: (1) the Claimants' interest as "heirs" is insufficient to establish standing; (2) Gabriel Kish III did not make an inter-vivos transfer of the firearms to the Claimants; and (3) the Claimants lack any other ownership interest in the firearms. (*Id.* at 6-11.) The Claimants argue that they have standing based on (1) Gabriel Kish III's will; (2) the fact that Gabriel Kish III made an inter-vivos transfer of the firearms prior to the seizure; and (3) the fact that Gabriel Kish IV and Gregory Kish "purchased certain firearms in the family collection." (Resp. at 2-6.)

### 1. Standing as "Heirs" to the Firearms

The Government argues that the Claimants "assert an interest in the defendant property as owners/heirs" and under Michigan law, "no person can be an heir during the

life of an ancestor." (Gov't Mot. Br. at 6.) Claimants state that "[a]lthough Gabriel Kish, III's last will did not make a specific devise of the family collection of firearms, his will did designate Gabriel Kish, IV as recipient of the residue of Gabriel Kish, III's estate. Therefore, Gabriel Kish, IV has a vested interest in that residue, including the family firearm collection." (Resp. at 2 (citation omitted).)

"'[T]he general federal practice in forfeiture matters' is to look to 'the law of the jurisdiction that created the property right to determine the petitioner's legal interest.'" *United States v. Salti*, 579 F.3d 656, 668 (6th Cir. 2009) (quoting *United States v. Speed Joyeros, S.A.*, 410 F. Supp. 2d 121, 125 (E.D.N.Y. 2006)). Michigan courts have exclusive jurisdiction over the estate of a decedent who was domiciled in Michigan or leaves an estate to be administered in Michigan. *See* Mich Comp. Laws § 700.1302. Gabriel Kish III was domiciled in Michigan and the firearms were seized in Michigan. Accordingly, Michigan law determines the legal interest in the property.

Michigan adheres to the black letter rule, *nemo est haeres viventis*, meaning "no one can be an heir during the life of an ancestor." *In re Estate of Finlay*, 424 N.W.2d 272, 277 n.12 (Mich. 1988) (citing *In re Marriage of Stephenson*, 460 N.E.2d 1 (Ill. Ct. App. 1983)). As the *In re Estate of Finlay* court explained,

> Wills, by their nature, are ambulatory until the testator dies. Until the death of the testator, the potential heirs and legatees have a mere expectancy interest. This interest has been defined in the following manner:
>
>> "'An expectancy or chance is a mere hope, unfounded in any limitation, provision, trust or legal act whatever; such as the hope which an heir apparent has of succeeding to the ancestor's estate. This is sometimes said to be a bare or mere possibility, and, at other times, less than a possibility. But it is less than a possibility in the specific sense of the term possibility. For, it is no right at all, in contemplation of law, even by possibility; because, in the case of a mere

> expectancy, nothing has been done to create an obligation in
> any event; and where there is no obligation, there can be no
> right because right and obligation are correlative terms.'"
>
> This definition makes it clear that potential heirs and legatees do not have
> a right in an estate until the testator dies.

*Id.* at 277 (citations omitted).  The decedent's heirs are vested with equitable title in the property at the time of death, and this title is "subject to the rights of creditors and the expenses of administration."  *In re Forfeiture of $234,200*, 551 N.W.2d 444, 446 (Mich. Ct. App. 1996).

Here, it is undisputed that the Claimants are asserting an interest based on their expectation that their father would leave the firearms to them when he died.  Gabriel Kish IV stated, "That was the thing, when us [sic] four kids were going to split them guns up evenly and fairly, upon his death.  That was part of our inheritance and we have been told this since we were tiny, and it fell on to me . . . ."  (Gov's Mot. Ex. 3 at 25.) He further stated, "Everything is even-steven, equal, when he is gone.  He was making death plans."  (*Id.* at 26.)  Gregory Kish stated that the reason why he was in this case was "because this is the only thing I will ever get from my father."  (Gov't's Mot. Ex. 5 at 13.)  When asked which specific firearms he is claiming, he replied, "Twenty-five percent of what was in that vault, I know that was ours."  (*Id.*)  In response to the question, "When did you learn that your father intended for you and your siblings to inherit the family or his gun collection?," Gregory Kish replied, "Since I was big enough to shoot one, five or six years old, that's all he ever talked about, 'This is the stuff I got put away for you.'"  (*Id.* at 18.)  Sherry Harness was asked if her father indicated to her "what he expected would happen with those guns when he died."  She replied, "Well, he

has told us all along that no matter what happened, in our relationship with him, all the guns were to be divided between the four of us." (Gov't's Mot. Ex. 4 at 14.)

These statements demonstrate that the claims are based on a mere inheritance interest in the firearms and not a "legally cognizable interest." *$267,961.07*, 916 F.2d at 1107. Gabriel Kish III could have changed his will at any time. He also could have sold the firearms or otherwise disposed of them before his death. If Gabriel Kish III had attempted to sell or dispose of the firearms, the children would have no legal recourse to stop him. Moreover, even if they were named as takers of the firearms in Gabriel Kish III's will at the time of his death, their right would be "subject to the rights of creditors and the expenses of administration." *In re Forfeiture of $234,200*, 551 N.W.2d at 446. The estate may not be large enough to cover Gabriel Kish III's debts and the expenses of administration, in which case the firearms would not make it to the residue to be distributed to Gabriel Kish IV. The Claimants' mere possibility of eventually obtaining the firearms is insufficient to confer standing to contest their forfeiture.

The Claimants acknowledge that the will can be changed at any time, but assert that "[i]f this Court were to award the firearms to Gabriel Kish, IV and his siblings, then those firearms would no longer be part of Gabriel Kish, III's estate, and would not be affected by any future changes in his will." (Resp. at 2.) Although technically a correct statement, the argument misses the point. Claimants must *first* demonstrate an interest in the firearms sufficient to confer standing to contest the forfeiture. Claimants are attempting to bootstrap potential success on the merits, which success necessarily assumes that a current interest in the firearms had been established, in order to assert

that very interest. The court will not act upon circular reasoning. Potential heirs have no right in an estate until the testator dies. *In re Estate of Finlay*, 424 N.W.2d at 277.

The Claimants also rely on *In re Estate of Bem*, 637 N.W.2d 506 (Mich. Ct. App. 2001), in which the Michigan Court of Appeals stated that "[i]n the context of a will, a person has a vested, not a contingent or conditional, interest if the testator's death is the only contingency that must occur before the interested person is entitled to receive the devise at issue." 637 N.W.2d at 517. In context, though, the discussion in *In re Estate of Bem* involved the construction of the will after the testator had died. *Id.* at 516. The issue involved the determination of whether the will was conditional. *Id.* That is, whether it was valid only if a condition precedent was satisfied – that the testator's death occurred on an enumerated trip. *Id.* But, as is true in virtually all will construction cases, the death of the testator was assumed in the analysis, a fact notably absent in the present case. In any event, to the extent that *In re Estate of Bem* can be read to establish a vested property right in a will beneficiary before the tesator dies, it is contrary to every other Michigan case to address this issue. *See, e.g.*, *In re Estate of Finlay*, 424 N.W.2d at 277 ("[P]otential heirs and legatees do not have a right in an estate until the testator dies."); *In re Jamieson Estate*, 132 N.W.2d 1 (Mich. 1965) ("A will, though often made while death is contemplated as a remote event, is to speak from the time the death takes place."); *In re Churchill Estate*, 203 N.W. 118 (Mich. 1925) ("[E]states given by will take effect and become vested on the death of the testator . . . ."); *In re Sutherby's Estate*, 312 N.W.2d 200, 201 (Mich. Ct. App. 1981) ("A will is ambulatory; no right accrues in the estate of the testator until the time of death.").

A Claimant must have a "legally cognizable interest" in the property, and a

potential taker under a will has "no right at all, in contemplation of law." *In re Estate of Finlay*, 424 N.W.2d at 277. The Claimants' expectancy interest is insufficient to establish a colorable ownership interest in the firearms. *$515,060.42*, 152 F.3d at 497. Therefore, the Claimants do not have Article III standing.

## 2. Standing as "Owners" of the Firearms

### a. Acquisition by Gift

The Government argues that the Claimants have failed to demonstrate a valid inter-vivos transfer of the firearms from Gabriel Kish, III to his children. (Gov't Mot. Br. at 7.) The Claimants argue that "the evidence supports the existence of an inter-vivos gift of the family collection prior to the seizure." (Resp. at 4.)

The elements of a valid gift are: "(1) the donor must possess the intent to transfer title gratuitously to the donee, (2) there must be actual or constructive delivery of the subject matter to the donee, unless it is already in the donee's possession, and (3) the donee must accept the gift." *Davidson v. Bugbee*, 575 N.W.2d 574, 576 (Mich. Ct. App. 1997) (citing *Molenda v. Simonson*, 11 N.W.2d 835 (Mich. 1943); *Children of the Chippewa, Ottawa & Potawatomy Tribes v. Regents of the Univ. of Michigan*, 305 N.W.2d 522 (Mich. 1981)). An inter-vivos gift is "made by one person to another without the inducement or the apprehension of death." *Keller v. McConville*, 141 N.W. 652 (Mich. 1913).

In this case, Gabriel Kish III did not possess the *present* intent to transfer title to the firearms to the children. It is undisputed that he intended for his children to have these firearms when he dies. But it is also undisputed that he never intended to give

the firearms to the children before then.[2]  As discussed above, the children's testimony makes clear that they were to receive these guns upon Gabriel Kish III's death.  (Gov'ts Mot. Ex. 3 at 25-26 ("That was the thing, when us four kids were going to split them guns up evenly and fairly, upon his death.  That was part of our inheritance . . . . Everything is even-steven, equal, when he is gone.  He was making death plans.").)  Gabriel Kish III's death was a condition precedent to the transfer of the firearms to the children.  Therefore, the children never received an interest in the firearms and thus do not have standing.

In addition, there was no delivery or acceptance of the firearms.  Sherry Harness was not even aware of the vault in the basement.  (Gov't's Ex. 4 at 10.)  Gregory Kish stated that he learned that his father intended for his siblings to inherit the family gun

---

[2]Gabriel Kish III's statements in his unsigned "affidavits" (i.e., statements) do not change the analysis.  Initially, his statement indicated that he intended to give away his firearms when he executed his will.  (Resp. Ex. 5.)  He later notified his attorney that this was incorrect and an amended statement was filed.  (Amended Ex. 1.)  The statement says that "[t]he guns seized from the basement vault of the Gun Barn always belonged to my children and grandchildren" and that "[m]y children and grandchildren became owners of the collection at birth."  (Id. ¶¶ 1, 2.)  It further states, "I always viewed myself as holding all of the firearms in the family collection, located in the basement vault of the Gun Barn, in trust for my children and grandchildren and their descendants."  (Id. ¶ 7.)  Gabriel Kish III may have "viewed" the firearms this way, but this is insufficient to convey a legal interest in the firearms to the children (or the grandchildren and other descendants).  For example, a grandmother may intend from the moment of her grandchildren's birth that they one day receive the family heirlooms.  However, this does not mean that the newborn grandchild then possesses a present legal interest in the heirlooms.  Until the grandmother actually gives the grandchildren the heirlooms complying with the three elements of a valid gift, or dies and the grandchildren inherit them, the grandchildren do not have a legally cognizable interest in the heirlooms.  If the grandmother were to take the heirlooms to an antiques dealer to sell them, the grandchildren have no legal recourse to prevent the sale.  Similarly, in this case, Gabriel Kish III's children could not have prevented him from selling any of the firearms in the basement vault.  He simply never conveyed a legal interest in the firearms to his children before they were seized.

collection since he was "big enough to shoot one" and that his father always talked about, "This is the stuff I got *put away* for you." (Gov't's Ex. 5 at 18 (emphasis added).) The Claimants note that Gabriel Kish IV owned the building and "off and on" had the combination to the vault. (Resp. at 5-6, Ex. 4 at 24.) However, he never exercised dominion or control over the firearms, and "bare legal title, in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture." *$515,060.42*, 152 F.3d at 498 n.6. Indeed, Gabriel Kish IV expressly refused to exercise dominion and control over the firearms, noting that the time was not right. (Gov't's Ex. 3 at 25 ("I will get them later, when the time is right. That was the thing, when us four kids were going to split them guns up evenly and fairly, upon his death.").) Accordingly, the purported inter-vivos gift does not establish standing.

### b. Acquisition by Purchase

The Claimants argue that "Gabriel Kish, IV and Gregory Kish purchased certain firearms in the family collection and therefore have Article III standing to challenge the forfeiture of those firearms." (Resp. at 4.) The Government contends that these claims lack specificity. (Gov't's Mot. Br. at 9; Gov't's Reply at 3.)

At her deposition, Sherry Harness stated, "I never purchased a gun to give to my father." (Resp. Ex. 2 at 9.) Gregory Kish and Gabriel Kish IV, on the other hand, both indicated at their depositions that they had purchased guns to give to their father. When Gregory Kish was asked whether he purchased any of the firearms to give to his father, he replied, "There was one. I can't tell you the serial number. I bought it from a guy I worked with. I mean I don't like to keep a lot of guns around my house, so that's stuff

that ended up in the vault." (Resp. Ex. 3 at 14.) Gabriel Kish IV stated that he told Special Agent Logwood that "there was a private collection, that that was stuff that my dad had collected for years, that I had helped with some of them. My other brother Jeff had helped with some of them." (Resp. Ex. 4 at 24.) When Gabriel Kish IV was asked, "You mentioned some of the guns, you believe were guns that you had given to your dad?," he replied, "It was, and some he just took from me in a father-and-son family way." (*Id.* at 27.) However, he admitted that there no records indicating that he owned the guns and explained, "It's not like that. I trust any of these people with anything I got. Dad wasn't like that, when it comes to stuff like that." (*Id.*) Then, the following exchange took place:

Q.   [W]hich specific firearms do you believe that you gave to your father?

A.   That I gave to my father, specifically? There's been a bunch, over the years, and I can't remember them all. I can see most of them. What comes to mind, right off the top, which was left behind because of it's a black powder pistol, out of the 1700s. The agents left that in the vault. That was not considered a firearm. That was one. There was a Remington Model 42 XBN forty 4250 and 308 Winchester, that I remember buying both those guns from the Lansing Gun Show at two different shows, because I brought the 308 and then six or eight months later, there was a .22 250 that matched it perfectly, and dad, those target guns, he loved them.

Q.   Why did you give the guns to your dad?

A.   Because I love my dad. Why would you give cufflinks to yours? We just gave guns instead of cufflinks. It's just the same.

Q.   Would it be fair to say that the guns you gave to your dad were a gift to your father?

A.   Yes. You know, yes and no. He would look at it, roll it around, and he would say, "Boy, that's too good for you, kid." I said, "Dad, why don't you take it home with you."

That's how our conversations pretty well went. I could have went

and got it tomorrow or the day after he died.  I wasn't worried about
it.

(*Id.* at 39-40.)

Purchasing a firearm and putting it in the vault to hold would likely be a sufficient interest to confer standing.  However, both Gregory Kish and Gabriel Kish IV's deposition testimony indicates that after they purchased the gun, they *gave* it to their father. (*See id.* at 40 (noting that they "just gave guns instead of cufflinks").)  Thus, they no longer have an interest in these guns.

This is consistent with both Gregory Kish and Gabriel Kish IV's claims.  Each claims the same firearms and that they should be split up "even-steven."  (*Id.* at 26.) Gregory Kish does not make a specific claim for the firearm that he purchased from a coworker and gave his father.  Indeed, he does not even know its serial number.  He instead claims "[t]wenty-five percent of what was in that vault."  (Resp. Ex. 3 at 13.) Gabriel Kish IV lists a few specific guns that he purchased; however, he never identifies which guns these correspond to in the Government's complaint.  (Resp. Ex. 4 at 40.) There does not appear to be a Remington Model 42 XBN forty 4250 in the guns he claims and there are four 308 caliber Winchesters in the guns he claims.

Gregory Kish and Gabriel Kish IV's general claims to a proportionate share of the firearms are insufficient.  "Each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" *Salti*, 579 F.3d at 667 n.11 (quoting *Lujan*, 504 U.S. at  561).  At this stage in the litigation, the Claimants have not put forward evidence sufficient to meet their burden of

demonstrating standing. Discovery has closed.[3] The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Gregory Kish and Gabriel Kish IV claim a proportionate share in the firearms in the "family collection," not specific ones. They expected to receive these firearms when their father died. As they no longer have an interest in the firearms that they purchased, they do not have standing to challenge their forfeiture.

## IV. CONCLUSION

For the reasons above, IT IS ORDERED that the Government's "Motion to Strike Claims of Gabriel Kish, IV, Gregory Kish, and Sherry Harness Based Upon Lack of Article III, Section 2 or Statutory Standing" [Dkt. # 53] is GRANTED. The claims of Gabriel Kish IV, Gregory Kish, and Sherry Harness are DISMISSED.

                                    S/Robert H. Cleland
                                    ROBERT H. CLELAND
                                    UNITED STATES DISTRICT JUDGE

Dated: March 12, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 12, 2010, by electronic and/or ordinary mail.

                                    S/Deborah J. Goltz
                                    Case Manager

_____

[3]Formal discovery ended on December 30, 2009, following two extensions granted by the court. During the status conference on December 22, 2009, the parties agreed to an inspection of the firearms at the ATF warehouse in Flint, Michigan the week of January 4, 2010. The Government attempted to arrange this inspection on January 8, 2010, and on January 22, 2010. However, the Claimants were unable to attend, in part, because Gabriel Kish IV was out of the state for the month of January on a hunting trip. (Claimants' Mot. to Stay Discovery at 2; Gov't's Resp. to Mot. to Stay Discovery Ex. 3.) The Claimants filed a motion to stay discovery pending resolution of the present motion and a motion on the burden of proof at trial. Both of these motions are now resolved; in a separate order, the court will terminate the motion to stay discovery as moot.