**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                Case No. 09-CV-10463

FOUR HUNDRED SEVENTY SEVEN (477)
FIREARMS,

        Defendants.

                                 /

**OPINION AND ORDER DENYING THE GOVERNMENT'S "MOTION FOR SUMMARY JUDGMENT" AND CONVERTING HEARING INTO A STATUS CONFERENCE**

Pending before the court is a "Motion for Summary Judgment," filed by the

Government on March 31, 2010. The court concludes a hearing on this motion is

unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will

deny the Government's motion.

**I. BACKGROUND**

This case is an *in rem* civil forfeiture action in which the Government requests the

forfeiture of 477 firearms. The firearms were seized after the execution of a federal

search warrant at the Highland Gun Barn, a gun store operated by Claimants Gabriel

Kish III and Deborah Summers in Highland, Michigan. (Am. Compl. ¶ 7(a).) Firearms

were retrieved from the main store area, the attic, a gun smithing area, a vault in the

basement, and other areas in the building. (*Id.* ¶ 7(ss); Resp. Ex. 9.)

The search warrant was issued following an undercover operation by the Bureau

of Alcohol, Tobacco, Firearms and Explosives ("ATF"). From August 2007 to July 2008,

undercover ATF agents purchased firearms from Summers and Kish III and exchanged

purported stolen merchandise for firearms. (Am. Compl. ¶ 7(j)-(oo).) Summers has never held a federal firearms license, and Kish III's federal firearms license was revoked in February 2005. (*Id.* ¶ 7(g)-(h).)

On September 17, 2008, Kish III and Summers were indicted for willfully engaging in the business of dealing in firearms without a license in violation of 18 U.S.C. § 922(a)(1). They were both convicted on April 17, 2009. Summers was sentenced to a term of imprisonment of 57 months; Kish III was sentenced to a term of imprisonment of 48 months.

In this case, the Government alleges that the firearms seized from the Highland Gun Barn are subject to forfeiture pursuant to 18 U.S.C. § 924(d)(1), which provides, in pertinent part, for the forfeiture of firearms "involved in or used in" any willful violation of 18 U.S.C. § 922(a)(1). (*Id.* ¶ 6.) Multiple persons filed claims to the firearms, including Kish III and Summers, as well as Kish III's children. The court dismissed Kish III's children's claims for lack of standing, and only the claims of Kish III and Summers remain. After their conviction, Claimants filed a "More Definite Statement of Claims," withdrawing their claims to the firearms that were "clearly offered for sale." (Claimants' 8/3/09 More Definite Statement of Claims ¶ 2.) On May 7, 2010, Claimants filed an amended claim withdrawing their claims to additional firearms. (5/7/10 Amended Claim.)

The court conducted a status conference on December 22, 2009, during which the parties noted a difference of opinion with respect to the burden of proof at trial and indicated that if the burden of proof issue was resolved unfavorably to Claimants, the case would likely be concluded. (12/23/09 Order Setting Briefing Schedule; *see also*

Claimants' 2/3/10 Mot. to Stay Discovery ("[D]epending on the rulings, discovery may become moot.").)  On March 10, 2010, the court resolved the burden of proof dispute, concluding that "based on the Government's clearly stated basis for bringing this action, it bears the burden of proving that the property is subject to forfeiture by a preponderance of the evidence." (3/10/10 Order at 8.)

The case proceeded and a status conference was held on March 18, 2010.  At the conference, the Government stated it intended to file a dispositive motion given the court's most recent rulings.  The court allowed the motion to be filed after the dispositive motion deadline based on the circumstances of the case and in the interests of justice. (3/19/10 Order Cancelling Pretrial Conference and Trial Dates.)  On March 31, 2010, the Government filed the present motion for summary judgment.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

3

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial. *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party discharges its burden by "'showing' –that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton,* 369 F.3d at 909 (citing *Matsushita*, 475 U.S. at 587). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.

## III. DISCUSSION

The Government argues that Kish III and Summers "willfully violated the Gun Control Act by engaging in the operation of an unlicensed gun business."[1] (Gov't's Mot. Br. at 2-8.) The Government also argues that it is entitled to summary judgment based

---

[1]The jury found beyond a reasonable doubt that Claimants willfully engaged in dealing in firearms without a license. Although the Government devotes over a third of its brief to this issue, this issue is not in dispute in this case.

The Government also devotes a page of its brief to its argument that Claimants are "unable to sustain their burden that they are innocent owners of the defendant property." (Gov't's Mot. Br. at 14-15.) This is not at issue in this case. Claimants were convicted of dealing in firearms without a license, which is the offense underlying this forfeiture proceeding. They are not now asserting the affirmative defense that they "did not know of the conduct giving rise to the forfeiture." 18 U.S.C. § 983(d).

on the doctrine of collateral estoppel and because the "weight of the evidence" establishes that the firearms are subject to forfeiture. (*Id.* at 8-17.)

## A. Collateral Estoppel

"Under the doctrine of collateral estoppel, or issue preclusion, 'once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'" *Hickman v. Comm'r*, 183 F.3d 535, 537 (6th Cir. 1999) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). Collateral estoppel applies if the following elements are met:

> (1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding; (2) determination of the issue must have been necessary to the outcome of the prior proceeding; (3) the prior proceeding must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Kosinski v. Comm'r*, 541 F.3d 671, 675 (6th Cir. 2008) (quoting *United States v. Cinemark USA, Inc.*, 348 F.3d 569, 583 (6th Cir.2003)).

## 1. Preclusive Effect of Conviction

The Government argues that "the doctrine of collateral estoppel bars claimants from relitigating issues resolved in their related criminal trial." (Gov't's Mot. Br. at 15.) Specifically, the Government contends that, at Claimants' criminal trial, their defense was that they were engaged only in occasional sales from their personal collection, and the jury rejected this testimony when it convicted Claimants of willfully violating the Gun Control Act. (*Id.* at 16.)

Claimants argue that the doctrine of collateral estoppel does not bar them from contesting the forfeiture of the guns in the basement vault. (Resp. at 13.) Claimants

argue that the jury could have convicted Claimants based on the sales of the firearms from the showroom.  (*Id.*)  Therefore, according to Claimants, the issue of whether the firearms in the basement vault were "involved in" the unlawful dealing in firearms "was not actually litigated in the criminal trial, nor was it necessary to a finding of guilt."  (*Id.*)

A criminal conviction may have a "preclusive effect in a subsequent civil proceeding between the government and the defendant."  *United States v. Beaty*, 245 F.3d 617, 624 (6th Cir. 2001) (citing *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951)).  However, a criminal conviction "does not, *ipso facto*, collaterally estop claimants from contesting the forfeiture."  *United States v. Three Tracts of Property Located on Beaver Creek, Knott County, Kentucky*, 994 F.2d 287, 290 (6th Cir. 1993).  Only issues that were essential to the verdict are regarded as determined by the prior criminal judgment.  *Beaty*, 245 F.3d at 624; *Hickman*, 183 F.3d at 537-38.

For example, in *Hickman*, the defendant was convicted of three counts of willfully failing to file income tax returns.  183 F.3d at 536-37.  At trial, the government introduced an exhibit indicating the defendant's tax liability.  *Id.*  These amounts were incorporated into the Presentence Report, and the district court ordered restitution in that amount.  *Id.* at 537.  The Commissioner of the Internal Revenue Service later issued a notice of deficiency to recover an amount in excess of what defendant paid in restitution.  *Id.*  The defendant sought review of the determination in Tax Court and argued that the Commissioner was collaterally estopped from asserting that the defendant owed more in taxes than the amount the district court determined he owed as restitution.  *Id.*  The Tax Court rejected this argument, and the Sixth Circuit affirmed.  *Id.* at 536-37.  The Sixth Circuit agreed that resolution of defendant's "specific tax liability

was not essential to the district court's judgment because it was not an element of the crime of conviction." *Id.* at 538. The court noted that the "jury was not asked to determine that specific tax liability." *Id.*

In this case, Claimants were convicted of "dealing in firearms without a license" in violation of 18 U.S.C. § 922. (4/17/09 Verdict.) The elements of dealing in firearms without a license are: (1) the defendant engaged in the business of dealing in firearms; (2) the defendant was not then a federally-licensed firearms dealer; and (3) the defendant acted willfully. (Jury Instructions, Tr. at 716-17.) As to a dealer in firearms, the term "engaged in the business" means:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such terms shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his collection of firearms.

18 U.S.C. § 921(a)(21)(C).

Similar to the precise tax liability in *Hickman*, identification of the specific firearms that were involved in the Claimants' unlawful dealing in firearms was an issue not determined by the jury. The jury could have found Claimants guilty based on their sales of firearms from the showroom and the attic. It was not essential to the jury's verdict that it find the firearms in the basement vault involved in the offense. Accordingly, collateral estoppel does not bar Claimants from contesting the forfeiture of these firearms.

The Government relies on *United States v. Beaty*, 245 F.3d 617 (6th Cir. 2001). In *Beaty*, the defendant was convicted of operating an illegal gambling business and numbers operation, despite his assertion of a defense of entrapment by estoppel. 245

F.3d at 619. In a related forfeiture proceeding involving money seized from the defendant's house, the Government moved for summary judgment and the defendant opposed the motion by arguing entrapment. *Id.* at 620-21. The district court granted the motion, reasoning that the entrapment defense was barred by collateral estoppel because it was already litigated in the criminal proceeding. *Id.* at 621. The Sixth Circuit affirmed, concluding that the elements of collateral estoppel were met. *Id.* at 624. The issue was identical in both the civil and criminal contexts. *Id.* It was litigated and determined as the defendant called witnesses and introduced evidence concerning this defense at trial. *Id.* The issue was necessary to the judgment because the trial judge specifically instructed the jury that it could not find the defendant guilty if he established an entrapment defense. *Id.*

Here, the Government's reliance on *Beaty* is misplaced. In *Beaty*, a jury verdict of guilty necessarily meant that the defendant's entrapment defense was rejected. The jury could not have found Beaty guilty if it found that the entrapment defense applied. In this case, on the other hand, the jury could have found Claimants guilty without finding that the firearms in the basement vault were involved in the offense. A guilty verdict meant that Claimants were not making "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby" or merely selling part of a personal collection of firearms. 18 U.S.C. § 921(a)(21)(C). Thus, the Government is correct that the jury necessarily rejected Claimants' defense that they were merely engaged in occasional sales from their personal collection. However, a jury could have reached this conclusion based on the sales of the firearms located on the main showroom, without finding that all of the firearms in the basement were

8

involved in the offense.  It cannot be determined from the jury's verdict which firearms they rejected as part of a personal collection.  It is conceivable that the jury found the firearms in the basement part of a personal collection yet not the firearms located elsewhere—in such a case, the Claimants would still have been guilty of dealing in firearms without a license.

## 2.  Preclusive Effect of Sentencing Findings

In passing, the Government references the court's determination at sentencing that the firearms in the attic and basement were available for sale and involved in the offense.  (Gov't's Mot. Br. at 14, 16.)  It argues that this determination precludes Claimants from challenging the forfeiture of the firearms found in the attic and basement.  (*Id.* at 16.)  Claimants argue that this is incorrect and cite a number of cases where courts have declined to give preclusive effect to sentencing findings.  (Resp. at 14 (citing, among others, *Kosinski*, 541 F.3d 671; *Maciel v. Comm'r*, 489 F.3d 1018 (9th Cir. 2007); *SEC v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999)).)

At Kish III's sentencing hearing, the court found:

> no reason to exclude the firearms that were found in the basement and in the attic . . . .  And the preponderance of the evidence convinces me that those firearms were indeed available for sale.  They were not a collector's item grouping of firearms.  They were, in large measure, common firearms that were "collected" if at all for the purpose of acquiring a stock in trade in order to sell, should a willing purchaser present himself and wish to buy such an item.
>
> So I am satisfied by the appropriate standard, that is a preponderance of the evidence, that more than 200 firearms were involved in the offense of dealing in firearms without a license.  And I accept the probation officer's, and accordingly, the Government's argument in that regard.

(9/1/09 Tr. at 39.)

When addressing Summers, the court found:

> with respect to Ms. Summers' activity, as it was with respect to Mr. Kish's activity, that there were certainly more than four, more than 200 firearms involved. And I do include those that were in the basement and in the attic and in the stairwells and various other places, in the back, in the front on racks, not on racks, in display cases, standing up against the wall and so forth. There were more than 200 firearms, 200 items that [are] defined as firearms under federal law involved in the offense of conviction, which was dealing in firearms without a license.

> There are various ways that that total can be arrived at, but one certainly could easily ignore the flea market 30, and still would be in the realm of 450 firearms . . . involved. So it's absolutely more than 200.

(*Id.* at 63-64.)

In *Kosinski*, the Sixth Circuit addressed the preclusive effect of sentencing findings. 541 F.3d at 675-79. At the defendant's sentencing, the district court made a determination as to the aggregate tax loss attributable to his actions, as directed by the Sentencing Guidelines. *Id.* at 675. The defendant was later assessed a tax deficiency, which was upheld by the Tax Court. *Id.* On appeal, the defendant argued that the district court's sentencing findings precluded the Tax Court's determination of the tax deficiency. *Id.* at 674.

The Sixth Circuit discussed the four requirements of issue preclusion and concluded that they were not met. *Id.* at 675-79. First, the court determined that the precise issue was not litigated because the district court made an aggregate finding for multiple years, not just for the year that was at issue in the Tax Court. *Id.* at 675-76. Second, the court determined that the sentencing court's findings were not necessary to the judgment. *Id.* at 676. The court stated that "the broad tax-loss bands of the guidelines diminish the contention that a given tax-loss finding was necessary to the sentence." *Id.* This was "only half the problem," though, because "[i]n the aftermath of

*Booker*, the guidelines *could not* constitutionally cause [the defendant's] sentence to turn on the district court's tax-loss finding." *Id.* (emphasis in original). As to the third element, the court concluded there was no final judgment, because at the time of the Tax Court's ruling, the district court's sentence had been vacated by the Sixth Circuit. *Id.* at 676-77.

Fourth, the court concluded that the government did not have a "full and fair opportunity" to litigate the issue at the sentencing. *Id.* at 677. The court cited the different procedural safeguards that are available in a civil proceeding versus a criminal sentencing. *Id.* For instance, at sentencing, the defendant has a limited opportunity for discovery and "has no absolute right either to present his own witnesses or to receive a full-blown evidentiary hearing." *Id.* (quoting *Monarch*, 192 F.3d at 305). The court also noted problems facing the prosecution in presenting evidence at a sentencing hearing, such as a defendant's invocation of the Fifth Amendment Self-Incrimination Clause and the lack of inference that can be drawn from this invocation. *Id.* at 677-78. Also, the Federal Rules of Evidence do not apply at a sentencing proceeding and the judge may consider any evidence, "so long as the information has sufficient indicia of reliability to support its probable accuracy." *Id.* at 677 (quoting *Monarch*, 192 F.3d at 205). Further, the court noted efficiency concerns with turning the sentencing hearing into a "mini-trial." *Id.* at 678 (citing *Monarch*, 192 F.3d at 306). The court also described potential differences in the parties' incentives to litigate between a sentencing hearing and later civil proceeding. *Id.* For instance, a party may not challenge a finding if it would have little impact on the ultimate guideline range and a defendant "will often choose not to challenge sensitive issues during sentencing for any number of reasons." *Id.*

After discussing the four elements, the court stated:

> After reading all of this, one might question how a determination reached in a criminal-sentencing proceeding could ever satisfy this issue-preclusion requirement-whether an individual or the government seeks to invoke the defense. And, to be sure, we know of no case (and the parties have cited none) where a federal court has ascribed preclusive effect to a sentencing court's findings of fact, and two other circuits have held issue preclusion presumptively inapplicable to sentencing findings. *See Maciel*, 489 F.3d at 1025; *Monarch*, 192 F.3d at 306. But to resolve this case we need not, and therefore do not, decide whether sentencing determinations categorically or even presumptively lack preclusive power.

*Id.* at 679. The court then concluded that the defendant's collateral estoppel argument "falls far short of the mark." *Id.*

Although *Kosinski* is not controlling on the preclusion issue presently before the court, the *Kosinski* court's application of the collateral estoppel elements provides guidance. Certainly the *Kosinski* case presented a more compelling case against the application of issue preclusion. For instance, in *Kosinski*, there was no precise finding regarding the defendant's tax liability for the year in question, whereas in this case the court specifically found by a preponderance of the evidence that the guns in the basement vault were available for sale. Also, unlike in *Kosinski*, there is no difference in the burden of proof between the two proceedings as the Government bears the burden of proof in both. Moreover, in this case, the district court's judgment has not been vacated, unlike the district court's judgment in *Kosinski*, which was vacated twice.

Nonetheless, the concerns raised by the *Kosinski* court regarding elements two and four are applicable to this case. With respect to the necessary to the judgment element, the court's sentencing finding for Guidelines purposes was that more than 200 firearms were involved in the offense. Under the Guidelines, when an offense involves 200 or more firearms, the defendant's base offense level is increased by ten. U.S.

12

Sentencing Guidelines Manual § 2K2.1(b)(1)(E).  Given this broad range and the fact

that there were 477 firearms seized, the court could have come to the same conclusion

under the Guidelines without making a finding as to 277 of the firearms, including the

firearms found in the basement.  Indeed, the court recognized this fact, stating that

"[m]ore than 200 firearms were involved in the principal crime at issue, completely

ignoring the firearms in the attic, the firearms in the basement, the firearms in the

stairwells, and the firearms in other places."  (9/1/09 Tr. at 38.)  But as the *Kosinski*

court stated, this is "only half the problem."  541 F.3d at 676.  "In the aftermath of

*Booker*, the guidelines could not constitutionally cause [the] sentence to turn on the

district court's [number of firearms] finding."  *Id.*  The court's ultimate discretion in

sentencing Claimants undermines the conclusion that the court's sentencing finding

regarding the number of firearms involved was necessary to the judgment.

Regarding the fourth element, the present civil forfeiture proceeding affords the

parties greater procedural safeguards than were available at the criminal sentencing

proceeding.  Moreover, the parties may not have had a great incentive to litigate the

precise issue of whether the firearms in the basement vault were involved in the

offense.  Even excluding the firearms found in the basement, the number of firearms

found in the main showroom, sold at the flea market, and purchased by the undercover

agents, convicted felons, and other witnesses exceeded 200 firearms.  Thus, Claimants

may have considered it unnecessary to vigorously contest the involvement of the

firearms in the basement vault.  Indeed, Claimants' arguments at the sentencing

hearing centered on the precise number of firearms found on the main floor, as opposed

to the involvement of the guns in the basement.  Also, for strategic purposes, Claimants

may have decided to focus on other avenues they were pursuing for lower sentences, such as Kish III's health. They may have believed they had a better chance at prevailing on these other issues and therefore did not want to overshadow these issues with extensive litigation involving a potentially losing argument with respect to the number of firearms. Also, the same efficiency concerns expressed by the *Kosinskli* court apply in terms of turning the sentencing proceeding into a "mini-trial." *Id.* at 678.

For these reasons, the court concludes that the doctrine of collateral estoppel does not bar Claimants from litigating the issue of whether the firearms found in the basement vault were involved in the unlawful dealing in firearms without a license.

## B. Firearms "Involved In or Used In" a Willful Violation of 18 U.S.C. § 922(a)(1)

In its motion, the Government argues that "the weight of the evidence establishes that the firearms were substantially connected to the underlying violation of the Gun Control Act." (Gov't's Mot. Br. at 8.) Claimants argue that genuine issues of material fact preclude the entry of summary judgment for the Government. (Resp. at ii, 15-20.)

Under the Civil Asset Forfeiture Reform Act ("CAFRA"), "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). If the Government's asserted basis for forfeiture is that the firearms were used to commit an offense or were involved in an offense, the Government must establish that there was a "substantial connection" between the firearms and the offense. *Id.* § 983(c)(3). To constitute a "substantial connection," the firearms "must have more than an incidental or fortuitous connection to criminal activity." *United States v. Schifferli*, 895 F.2d 987, 990 (4th Cir. 1990).

The Government is seeking forfeiture of the firearms pursuant to 18 U.S.C. §

924(d)(1), which provides that "[a]ny firearm or ammunition involved in or used in any . . . willful violation of [§ 922(a)(1)(A)] shall be subject to seizure and forfeiture."  Neither "used in" nor "involved in" are defined in the statute; therefore, the words must be construed according to their ordinary meaning.  *Smith v. United States*, 508 U.S. 223, 228 (1993).  The ordinary meaning of "use" is "to convert to one's service or to employ" or "to make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of."  *Id.* at 229 (interpreting use in the § 924(c)(1) context, but stating that using a firearm has the same meaning in § 924(c)(1) as it does in § 924(d)) (internal quotation marks and citations omitted).  "Involved in" has a more expansive meaning than "used in" to "effectuate Congress' intention that forfeiture apply to the unique crimes enumerated in § 922, which may be committed without ever using a firearm."  *United States v. Cheeseman*, 600 F.3d 270, 280 (3d Cir. 2010).  The ordinary meaning of "involved" is "(1) to engage as a participant; (2) to relate closely; (3) to have within or as part of itself; and (4) to require as a necessary accompaniment."  *Id.* at 278 (internal quotation marks and citation omitted).

In the context of offenses premised on unlawful firearm sales, courts have addressed the forfeiture of other firearms "involved in" the offense.  Courts have often looked to whether the guns were displayed in the same area as the guns that were unlawfully sold and whether the guns had price tags on them.  *United States v. Eighty-Six Firearms and Twenty-Two Rounds of Ammunition*, 623 F.2d 643 (10th Cir. 1980) (per curiam) ("There is little reason to doubt that the long guns would willingly have been sold to the agents if they had asked.  There were price tags on them . . . they were displayed on the premises in view of the prospective buyers." (citation omitted)); *United*

*States v. One Assortment of 12 Rifles and 21 Handguns*, 313 F. Supp. 641, 641 (N.D. Florida 1970) ("None of the guns here seized was sold to plaintiff's agents although testimony adduced at trial conclusively showed that they were on display in the same area where the sales were made and no doubt would have been sold by intervenor had there been a willing buyer."). However, courts have not merely presumed that all firearms possessed by a defendant convicted of unlawful firearms dealing are automatically subject to forfeiture. For example, in *United States v. Approximately 627 Firearms, More or Less*, 589 F. Supp. 2d 1129, 1131-32 (S.D. Iowa 2008), the defendant pleaded guilty to dealing in firearms without a license based primarily on sales of guns at an open-air gun show. Following the execution of a search warrant, ATF agents seized 684 firearms from the defendant's property, and the Government sought forfeiture of 627 of the seized firearms. 589 F. Supp. 2d at 1131. The court ordered the forfeiture of all of the firearms, except for 20 to 25, based in part on defendant's testimony that while 20 to 25 of his guns were personal, the remainder were the ones he "enjoyed buying and selling." *Id.* at 1133-35. As to the 20 to 25 firearms, the court credited the defendant's testimony that he was an avid hunter and that these were personal guns. *Id.* at 1135. The court concluded:

> The firearms which Hummel held for personal use are not subject to forfeiture simply because the vast majority of seized firearms were "involved in" the underlying offense. The Government bears the burden to establish that *each* of the 627 firearms at issue were "involved in" Hummel's offense. The Court finds that it did not meet its burden with respect to Hummel's unidentified personal firearms.

*Id.*

The question before the court is whether, in viewing the evidence in the light most favorable to Claimants, a rational trier of fact could find that the Government has

not met its burden of showing by a preponderance of the evidence that the firearms in the basement vault were used in or involved in the willful dealing in firearms without a license.  *Three Tracts of Property Located on Beaver Creek*, 994 F.2d at 290.  The Government and Claimants have provided the court with the following evidence and arguments based on the summary judgment record.

First, the Government notes that the guns were seized from the building in which Claimants were convicted of "operating an illegal gun business."  (Gov't's Reply at 2; *see* Gov't's Mot. Br. at 10-11.)  This building was "on a major thoroughfare with a sign, Highland Gun Barn, beckoning customers interested in purchasing firearms."  (Gov't's Reply at 2.)  Claimants argue that merely being housed in the same building where they were operating an illegal gun business does not establish that these guns were involved in or used in the offense.  (Resp. at 6.)  Claimants assert that the cases establish that "all firearms on a premises where such violation has occurred are not presumably subject to forfeiture."  (*Id.* at 8 (citing *United States v. One Assortment of Seven Firearms*, 632 F.2d 1276 (5th Cir. 1980).)

Second, the Government points to Agent Chandler's testimony that Kish III told him that "he had firearms in the building that were not on display that . . . he could sell me a firearm from," that "half of the inventory was new since the last time [Chandler] had been in there," and that "basically there's a turn-over almost daily."  (Gov't's Mot. Exs. 23, 25, 26, Trial Tr. at 317, 323-24.)  Agent Chandler testified that Kish III stated that, for insurance purposes, he could only display 200 firearms.  (Gov't's Mot. Ex. 26, Trial Tr. at 324.)

Third, the Government states that Agent Chandler's inquiry regarding purchasing a firearm was "followed by Ms. Summers prompt production of a double-barrelled shotgun with no price tag and Kish's comment, 'This gun just became available for sale.'" (Gov't's Mot. Br. at 10.) Kish III testified that the gun was recently taken from the rack and placed in Summers's flea market truck and that Summers retrieved the gun from the truck. (Gov't's Mot. Br. at 10; Trial Tr. at 472.) The Government contends that this testimony is contradicted by the agent's testimony that surveillance agents did not observe Summers go outside. (Gov't's Mot. Br. at 10.) Claimants argue that this evidence does not establish that the gun came from the basement vault, particularly when there is no evidence that she went downstairs or had a combination to the vault. (Resp. at 15.) Claimants further argue that the fact that the gun was "promptly" produced weighs against finding that she retrieved the gun from a locked vault. (*Id.*)

Fourth, the Government alleges that "the great majority of the guns found in the vault were not collectible items." (Gov't's Mot. Br. at 11.) The Government states that there were multiple guns of the same make and model, the guns were "extremely common," and "there is no apparent reason why a genuine collector would want multiple copies of such weapons." (*Id.*) As an example, the Government notes that one of the firearms found in the vault was a Remington .17 HMR, a common make and model with "no inherent value as a 'collectible,'" purchased from Dicks Sporting Goods in July 2005, after Kish III's firearms license was revoked. (*Id.*) Claimants argue that the Government's argument regarding collectibles is unsupported by the record and is mere speculation. (Resp. at 16.) Also, Gabriel Kish IV stated in an affidavit that based on his experience, "gun collectors do tend to acquire duplicates of firearms they consider

18

valuable or admire for their inherent qualities" and that "[m]any of the guns in [his] father's collection which might appear to be duplicates are actually variations of the same model." (Resp. Ex. 1, Aff. of Kish IV, ¶¶ 29-30.) Kish IV then, at length, describes how certain of the firearms are collectible. For instance, he takes issue with the Government's assertion that "14 Winchester model 67/68, .22 caliber rifles" were the "same make and model." (*Id.* ¶ 33 (quoting Gov't's Mot. Br. at 11.).) Kish IV stated that these are three different models with different configurations and that "[p]er the Blue Book, they were made from 1934-1963 and valued as high as $685 with a 30% enhancement for the 'boy's rifle' configuration and 100% for smooth bores, which [his] father did have in the collection." (*Id.*) Kish IV also notes that some of the firearms are collectible because they have been discontinued, (*id.* ¶ 32), and that many of the guns that the Government contends are the same make and model are different based on the length of the stocks, types of wood, and other differences, (*id.* ¶¶ 35-36).

Fifth, the Government argues that Kish III's testimony that there was a sign on the vault stating "Private Personal Collection Not for Sale" was refuted by the testimony of Agent Miller and is refuted by "common sense." (Gov't's Mot. Br. at 11.) In response, Claimants attach an affidavit from Gabriel Kish IV, stating that he observed this sign on the door a month before the raid and on many prior occasions. (Resp. Ex. 1, Aff. of Kish IV, ¶ 22.) Kish IV stated that he had a similar sign at his business and that he told his father to place the sign on the basement vault based on the advice he received from two ATF agents who inspected his business in 2006. (*Id.* ¶¶ 24-26.) Claimants attach a picture of the door which they say shows tape remnants from the sign. (Resp. Ex. 8.)

Sixth, the Government alleges that the agents "seized 240 firearms in the vault,

including several with price tags on them, as shown by photographs taken the day of the search." (Gov't Mot. Br. at 10.) According to Kish IV, however, the exhibit cited by the Government for this proposition is not a picture of the basement vault, but instead a display rack on the main floor or attic. (Resp. Ex. 1, Aff. of Kish IV, ¶ 42.) In the pictures taken by the Government after the raid, tags are visible on approximately four of the firearms in the basement vault, but the vast majority do not appear to have price tags. (Resp. Ex. 6.) Kish IV states that the firearms with tags in the basement vault were not seized by the ATF agents and that the tags contained descriptions, not prices. (Resp. at 16; Resp. Ex. 1, Aff. of Kish IV, ¶ 41.) Claimants have attached pictures from the basement vault that were taken after the raid that appear to corroborate Kish IV's assertions. (Resp. Exs. 3-5.)

Seventh, the Government attaches an affidavit from ATF Industry Operations Investigator Vickie Kopcak, who stated that during an inspection in 2001, before Kish III's firearms license was revoked, the firearms in the basement vault were listed on the Highland Gun Barn's Acquisition and Disposition Book. (Gov't Reply Ex. 5.) Kish IV states that after his father lost his firearms license, he personally removed the guns from the basement vault and transferred them to the inventory of his gun store. (Resp. Ex. 1, Aff. of Kish IV, ¶ 40.) He further states that the "Kish Family Collection" was moved to the basement vault in 2005. (*Id.* ¶ 12.)

Claimants also point to the depositions of Kish III's children, in which they allege that their father told them they would inherit the firearms in the basement vault. For instance, Kish IV stated, "That was the thing, when us [sic] four kids were going to split them guns up evenly and fairly, upon his death. That was part of our inheritance and

we have been told this since we were tiny . . . ."  (Resp. at 18; Gov't's Mot. to Strike Ex. 3 at 25.)

Unlike the firearms in *Eighty-Six Firearms and Twenty-Two Rounds of Ammunition* and *One Assortment of 12 Rifles and 21 Handguns*, the firearms in this case were not on display in view of prospective buyers.  The firearms located in the basement vault are not subject to forfeiture simply because the other firearms found in the Highland Gun Barn were clearly involved in the offense.  *Approximately 627 Firearms, More or Less*, 589 F. Supp. 2d at 1135.  Besides the fact that the guns were found in the same building in which Claimants were unlawfully dealing in firearms without a license, most of the facts surrounding the guns in the basement vault are in dispute—whether there was a sign on the basement vault door, whether the firearms are collectible, whether the firearms in the basement vault had price tags, whether the firearms in the basement vault were intended as an inheritance for Kish III's children, whether Summers went into the basement vault to retrieve the firearm she sold to Agent Chandler, whether Kish III's statement that firearms were available for sale other than those on display included the firearms in the basement vault or only those found in other parts of the building.  If a jury were to credit Claimants' version of these facts, it could come to the conclusion that the Government had not met its burden of proving that some or all of the firearms in the basement vault were "involved in" the underlying offense, under the plain meaning of the phrase.  *Cheeseman*, 600 F.3d at 278.

The Government cites *Cheeseman* in support of its argument.  (Gov't's Mot. Br. at 9.)  In *Cheeseman*, the defendant pleaded guilty to possession of a firearm or ammunition by a regular user or addict of controlled substances.  600 F.3d at 274.  The

defendant was addicted to crack cocaine, lived in the warehouse of his gun store, and occasionally had other crack cocaine users stay with him there. *Id.* at 273. Federal agents seized approximately 609 firearms and ammunition from the defendant's gun store. *Id.* The district court ordered forfeiture, and the Third Circuit affirmed, holding that "possession of firearms and ammunition is sufficient for a district court to find that the property was 'involved in' a § 922(g)(3) offense." *Id.* at 275, 280.

The reasoning of *Cheeseman* does not apply to this case. Possession of a firearm by a drug abuser was the underlying offense in *Cheeseman*. It was undisputed that Cheeseman was a drug addict and had unfettered access to the guns in his store. However, the firearms in this case are not alleged to have been involved in an offense involving possession. If possession was the underlying offense, the firearms in the basement vault would certainly be subject to forfeiture as there is no dispute that Claimants possessed these firearms. The underlying offense in this case, however, entails dealing in firearms, and there are material facts in dispute that could sway a jury in its decision as to whether the firearms in the basement vault were involved in the unlawful dealing in firearms.

## IV. CONCLUSION

Accordingly, IT IS ORDERED that the Government's "Motion for Summary Judgment" [Dkt. # 75] is DENIED.

IT IS FURTHER ORDERED that the May 19, 2010 hearing is CONVERTED into

a status conference.  Counsel for the parties are DIRECTED to appear for a status

conference on **May 19, 2010 at 2:00 p.m.**

            s/Robert H. Cleland
           ROBERT H. CLELAND
           UNITED STATES DISTRICT JUDGE

Dated:  May 18, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, May 18, 2010, by electronic and/or ordinary mail.

            s/Lisa G. Wagner
           Case Manager and Deputy Clerk
           (313) 234-5522